# Commonwealth *v.* Mellet, Appellant.

*Evidence—Incompetent evidence—Rendered competent—Appeals—Review—Oleomargarine.*

The admission of incompetent evidence will not be grounds for reversal where it is afterwards rendered competent by the introduction of other evidence.

Where on the trial of an indictment for selling oleomargarine colored to look like yellow butter, a sample of white oleomargarine and a sample of creamery butter are admitted for the purpose of comparison, but without any evidence as to the genuineness of the samples, the judgment against the defendant will not be reversed for that reason, if it appears that an expert witness subsequently testified that the samples were what they were alleged to be.

*Criminal law—Oleomargarine—Cotton-seed oil—Evidence.*

On the trial of an indictment for selling oleomargarine colored to look like yellow butter where the evidence shows that the color was due to cotton-seed oil, it is proper to sustain an objection to the following question asked upon cross-examination of a witness: "And cotton-seed oil, as an ingredient, is recognized as a legitimate ingredient, is it not?" Such a question is not tantamount to asking a witness whether it is an essential ingredient, or one commonly used, but involves for its complete answer a construction of the statute which it is not within the province of the witness to give.

On the trial of an indictment for selling oleomargarine colored yellow to resemble butter, if it is competent for the defendant to prove that cotton-seed oil is, in a commercial sense, a necessary constituent of oleomargarine, it is equally competent for the commonwealth to introduce the explanatory proof in rebuttal that the necessary result of the use of cotton seed is not to give the product in which it is used the color of yellow butter.

*Trial—Evidence—Charge—Testimony stricken out.*

A trial judge cannot be convicted of giving an instruction based on testimony that had been stricken out, where it appears that the testimony referred to had been objected to, and a motion made immediately after it was given to strike it out, but that the record did not show that the motion was allowed, nor that any exception was taken, nor that the court requested the jury to disregard it.

*Criminal law—Oleomargarine—Colored oleomargarine—Constitutional law.*

On the trial of an indictment for selling oleomargarine "made or colored so as to resemble or be in imitation of yellow butter," a conviction may be sustained, although there is no evidence of the artificial coloration of the oleomargarine by the addition thereto, in the process of manufacture or afterwards, of any substance which had no other function than to cause it to resemble and be in imitation of yellow butter.

The various provisions of the Act of May 29, 1901, P. L. 277 show a studied effort to prevent the sale of oleomargarine, which by reason of the addition of coloring matter, or of the selection or treatment, or combination of its component parts, is made to resemble and be in imitation of yellow butter.

A consideration of the Acts of May 21, 1885, P. L. 22, May 5, 1899, P. L. 241, and of the Act of May 29, 1901, P. L. 327, show that the latter act is not to be given a construction which will restrict it to "artificial coloration" produced by the admixture of some substance which serves that purpose only.

*Constitutional law—Legislative power—Judicial power.*

Except where the constitution has imposed limits upon the legislative power, it must be considered as practically absolute, whether it operate according to natural justice or not in any particular case. The courts are not the guardians of the rights of the people of the state, except as those rights are secured by some constitutional provision which comes within the judicial cognizance. The protection against unwise and oppressive legislation, within constitutional bounds, is by an appeal to the justice and patriotism of the representatives of the people. If this fail, the people in their sovereign capacity can correct the evil, but courts cannot assume their rights. The judiciary can only arrest the execution of a statute when it conflicts with the constitution.

Argued April 18, 1904.    Appeal, No. 51, Oct. T., 1904, by defendant, from judgment of Q. S. Schuylkill Co., March T., 1903, No. 204, on verdict of guilty in case of Commonwealth v. Michael Mellet. Before Rice, P. J., Beaver, Orlady, Smith, Porter, Morrison and Henderson, JJ.    Affirmed.

Indictment for selling colored oleomargarine.    Before Marr, J.

The indictment charged " that M. V. Mellet on the 15th day of December, in the year of our Lord one thousand nine hun-

dred and two, at the county aforesaid and within the jurisdiction of this court, with force and arms, etc., did unlawfully sell unto one Robert M. Simmers one (1) pound of oleomargarine at the rate or price of twenty cents per pound, which said oleomargarine had not been made and kept free from all ingredients which caused it to look like yellow butter, and which said oleomargarine was then and there not made from pure, unadulterated milk or cream from the same without the addition of any fat foreign to the said milk or cream, and was then and there made from fats, oils and other oleaginous compounds foreign to the said milk or cream, and then and there contained ingredients which caused it to resemble and look like yellow butter, and to be then and there an imitation of yellow butter, contrary to the form of the act of the general assembly in such case made and provided, and against the peace and dignity of the commonwealth of Pennsylvania."

Verdict of guilty upon which the court passed judgment of sentence that the defendant pay a fine of $300 to the commonwealth. Defendant appealed.

*Errors assigned* appear from the opinion of the Superior Court.

*Joseph M. Smith*, with him *John L. Burns* and *John F. Whalen*, for appellant.—A sample of alleged pure butter may not be offered in evidence without proof of its character or ingredients.

An expert witness may be asked on cross-examination whether a certain ingredient is recognized as a legitimate ingredient of oleomargarine.

The act of May 29, 1901, does not forbid the sale of pure oleomargarine not artificially colored.

The decisions of the courts are in favor of the defendant's contention in this case: Ammon v. Newton, 50 N. J. L. 543 (14 Atl. Repr. 610); Bennett v. Carr, 96 N. W. Repr. 26; Com. v. McCann, 14 Pa. Superior Ct. 221; Com. v. Vandyke, 13 Pa. Superior Ct. 484.

Any other construction of the act, and especially that construction contended for by the commonwealth, would be unconstitutional: Plumley v. Massachusetts, 155 U. S. 461 (15 Sup. Ct. Repr. 154); People v. Arensberg, 105 N. Y. 123

(11 N. E. Repr. 277); Collins v. New Hampshire, 171 U. S. 30 (18 Sup. Ct. Repr. 768).

*C. E. Breckons,* with him *C. A. Snyder* and *C. E. Berger,* for appellee.—We do not agree with the learned counsel for the appellant, in the statement of the ninth assignment, that there was no evidence of the use of artificial coloration in the material sold. On the contrary, an examination of the testimony will prove that four important facts were established:

*a.* The color of the oleomargarine sold by the defendant was produced by the use of cotton-seed oil used in its manufacture.

*b.* It was not proved in this case that cotton-seed oil is an essential ingredient in the manufacture of oleomargarine.

*c.* Oleomargarine can be manufactured which does not look like yellow butter, and a sample of such oleomargarine was produced and exhibited on the trial.

*d.* That since the passage of the act of May 29, 1901, cotton-seed oil is treated so as to retain a certain portion of the color and eliminate other portions of the color, and this is done for the purpose of giving to oleomargarine the yellow color.

If these facts are correct, and we submit that an examination of the testimony will establish them beyond any question, it follows that the prohibition of the use of cotton-seed oil as an ingredient does not necessarily prohibit and prevent the manufacture and sale of oleomargarine, but only of such oleomargarine as the legislature in the exercise of its powers saw fit to prohibit.

OPINION BY RICE, P. J., January 17, 1905:

The defendant was convicted upon an indictment charging him with having sold a certain quantity of oleomargarine, which had not been made and kept free from all ingredients which caused it to look like yellow butter, and was not made from pure unadulterated milk or cream from the same, without the addition of any fat foreign to the said milk or cream, and was made from fats, oils and other oleaginous compounds foreign to milk or cream, and contained ingredients which caused it to resemble and look like yellow butter, and to be an imitation of yellow butter. The indictment was drawn under the Act of May 29, 1901, P. L. 327. The questions for decision upon this appeal will appear as we proceed.

1. After having proved the sale, the commonwealth offered in evidence for the purpose of comparison with the oleomargarine in question two samples, one bought from a dealer as creamery butter and the other from another dealer as white oleomargarine. If the only proof that these samples were what they were alleged to be consisted simply in the fact that they were so represented by the dealers from whom they were bought, the objection to their admission in evidence, especially as to the oleomargarine, would not have been without merit. But we cannot say that a chemical analysis was an absolutely essential prerequisite to their admission in evidence for the purpose stated. The witness who bought them, and produced and identified them on the trial, was an agent of the state dairy and food department, who claimed to have had large experience and to have acquired thereby the ability, by testing, applying the heat test and examining the grain, to tell the difference between butter and oleomargarine and to testify that those samples were what they were alleged to be. If, therefore, there was technical error in admitting them in evidence without this preliminary proof, it was cured by the subsequent testimony of the witness above alluded to. The general rule is, and we regard this as a proper case for its application, that the admission of incompetent evidence will not be ground for reversal where it was afterward rendered competent by the introduction of other evidence.

2. The testimony of the chemist called by the commonwealth was to the effect that the yellow color of the oleomargarine bought from the defendant was due to the presence of cotton-seed oil, and that whatever color the cotton-seed oil in the sample had was its own color; that is, that no foreign substance had been added to the cotton-seed oil to produce that color. Upon cross-examination he was asked this question: " And cotton-seed oil, as an ingredient, is recognized as a legitimate ingredient, is it not ? " The question was not tantamount to asking him whether it is an essential ingredient, or one commonly used, but involved for its complete answer a construction of the statute which it was not within the province of the witness to give. Therefore the court was clearly right in sustaining the objection to it.

3. The defendant's witness testified that this oil is obtained by

pressing the seeds of the cotton plant, that it is purely vegetable, and that, in a commercial sense, it is a necessary constituent of oleomargarine. We quote a portion of his testimony and the questions in response to which it was given: " Q. Would you say now it was a necessary ingredient, or would you just base your conclusion upon the assumption that you then made? A. I would say that by the conditions of trade, the conditions of commerce at the present time, cotton-seed oil was a necessary constituent of oleomargarine." Mr. Snyder: " Q. Conditions of commerce caused by what—legislation? A. No; by simply the question of cheapness." In rebuttal the commonwealth's witness was permitted to testify under objection and exception as follows: " Q. You may state whether or not, from your examination and analysis of cotton-seed oil since 1901 and before, there was a decided and characteristic difference. . . . A. There is. Q. In what respect? A. In regard to the amount of color in the cotton-seed oil used. Oleomargarine was uncolored. White oleomargarine contained cotton-seed oil before that time, but samples that were very slightly colored, only the faintest yellowish tinge, had a yellow tinge at that time due to coal-tar color, even though they contained cotton-seed oil. Q. Which has now been eliminated? A. And the coal-tar color is now eliminated. Q. And the cotton-seed refined to bring it up to the yellow standard? A. The cotton-seed oil is so treated as to retain a certain portion of the color and eliminate other portions of the color. It must be specially treated for this purpose." He further testified under cross-examination: " Prior to 1901 the coloring matter in oleomargarine was due to vegetable coloring matters, such as anatto, or to coal-tar coloring substances. It was not due to cotton-seed oil." We shall have occasion, in discussing another branch of the case, to refer again to the testimony upon this point, but for the present it is enough to say, that, if it was competent for the defendant to prove that cotton-seed oil is, in a commercial sense, a necessary constituent of oleomargarine, it was competent for the commonwealth to introduce the explanatory proof in rebuttal that the necessary result of the use of this ingredient is not to give the product in which it is used the color of yellow butter. A legitimate mode of establishing this fact was by proving, that, although prior to

1901 it was used as an ingredient as it has been since, yet it was not so treated in the process of manufacture or refinement as to produce that result. We see no error of which the defendant can complain in the admission of this testimony.

4. We quite agree with the counsel for the defendant that it is erroneous to give an instruction to the jury based on rejected testimony or testimony that has been struck out; but we do not think the record plainly shows that this rule was violated. True, a portion of the testimony alluded to by the trial judge in that part of his charge which is the subject of the fifth assignment of error was objected to, and a motion was made, immediately after it was given, to strike it out; but the record does not show that the motion was allowed, nor that any exception was taken, nor was the court requested to charge the jury to disregard it. Moreover, the testimony alluded to related to the oleomargarine bought in January, which was the subject of the indictment, tried before the same jury and at the same time as this one, and upon which the defendants were acquitted. Under all the circumstances to which we have alluded we cannot affirm that this assignment contains reversible error; it is therefore overruled.

5. R. H. Simmers testified that he made two purchases of oleomargarine, one from the defendant personally in December, and the other from his clerk in January, and sent both to Mr. Cochran for analysis. The two indictments based on these sales were tried together. This case is based on the December sale. As we understand the testimony of Simmers when recalled upon the witness stand, he identified the two samples then before him, concerning which the previous testimony related, as being the oleomargarine he had bought in December and January and sent to Mr. Cochran for analysis. The testimony of the latter witness, so far as he went into details, related to the oleomargarine bought in January, but he also testified that he received and examined two samples alleged to have been bought from the defendant, and that what he had testified relative to the January sample applied as well to the other. Taking the testimony of these two witnesses as a whole, we are unable to sustain the seventh assignment, which is to the effect that binding instructions ought to have been given

for the defendant because there was no evidence of analysis of the substance bought in December. In the view we take of the law of the case, the sixth assignment does not require particular discussion.

6. This brings us to the ninth assignment by which the principal question in the case is sought to be raised. It reads as follows : " Under all the evidence in the case, there being no evidence of the use of artificial coloration in the material sold, the learned trial judge should have instructed the jury to find for the defendant." We pass the objection that this assignment is not based on the refusal of a point requesting such instructions, and proceed to a consideration of the question sought to be raised by the defendant's counsel and fully argued by counsel on both sides. We do so more willingly because it was squarely raised in another case argued before us in December last (Commonwealth v. Caulfield, post, p. 279) and must be met. If by " artificial coloration " is meant the addition of some substance for the sole purpose of giving the material sold the color of yellow butter, and without which the material would still have all the essential food qualities of oleomargarine or butterine, the counsel are right in saying that there is no evidence in the case of artificial coloration. But as we have already pointed out, there is evidence from which the jury could have found that, although no such substance was added to the oleomargarine itself, or to the ingredients of which it was composed, yet that one of these ingredients, cotton-seed oil, was so treated in the process of its manufacture or refinement as to leave in it, or impart to it, a yellow color which it, in turn, imparted to the oleomargarine of which it became a constitutent ; in other words, that the color of yellow butter, which was thus imparted, is not an essential quality or characteristic of cotton-seed oil. It is argued with plausibility by the counsel for the commonwealth that this evidence tends to show that there was " artificial coloration " of the oleomargarine sold by the defendant. We are disposed, however, not to rest our decision upon this proposition, but to consider the broader question, whether a conviction under the act of 1901 is sustainable without proof of the addition, in the process of manufacture or afterwards, of some substance which has no other function than to give the article sold the color of yellow butter, and without which the

article would still have all the essential qualities of oleomargarine or butterine?

We held in Commonwealth v. Vandyke, 13 Pa. Superior Ct. 484, that the sale of oleomargarine, which was colored in imitation of yellow butter by the admixture of the same coloring matter that is used in coloring pure butter, was in violation of the Act of May 5, 1899, P. L. 241, and that the prohibition of the sale of oleomargarine so colored, although manufactured in another state and brought into this state and sold in the original package, was not repugnant to the commerce clause of the federal constitution. In Commonwealth v. McCann, 14 Pa. Superior Ct. 221, affirmed in 198 Pa. 509, we sustained a conviction under the act of 1899 where it appeared from the record of the alderman that the defendant sold oleomargarine duly marked as such, but "colored yellow by the addition thereto of analyne, a foreign substance but not injurious to health." In neither of these cases did the precise question which is now presented arise upon the record; both were cases of artificial coloration by the admixture of foreign substances which served that purpose only. It is argued, however, that in construing the act of 1899 we held, inferentially at least, that the act was aimed at that kind of coloration only. We would not be candid if we were to deny that there is any expression in our opinion in the McCann case that seems to sustain such inference. The idea intended to be expressed was not as clearly expressed as it might and ought to have been; we think, however, taking the opinion as a whole, and viewing it in the light of the facts to which it related and the question for decision, that it does not necessarily lead to the conclusion for which counsel contend. Be that as it may, we are now dealing with the act of 1901, in which the intention of the legislature seems to us to be more clearly expressed than in the act of 1899. We therefore dismiss the cases above cited with the remark that they were correctly decided on their facts, but they do not rule the present case one way or the other.

The first section of the act of 1901 provides, inter alia, that no person shall sell "oleomargarine, butterine, or any similar substance, article, product or compound, made wholly or partly out of any fats, oils or oleaginous substance, or compound

thereof, not produced from pure unadulterated milk or cream from the same, . . . . and which shall be in imitation of yellow butter, produced from pure, unadulterated milk or cream of the same, with or without coloring matter, unless such person . . . . shall have first obtained a license . . . . ; nor unless the said article, product or compound . . . . shall be made and kept free from all coloration or ingredients causing it to look like yellow butter." The second section provides, inter alia, that every person desiring to sell "oleomargarine, butterine, or any similar substance, not made or colored in imitation of yellow butter" may, upon certain conditions, obtain a license authorizing him to engage in the sale of "oleomargarine or butterine, or any similar substance, which shall not contain any coloration or ingredient that causes it to resemble or be in imitation of yellow butter;" and after thus stating what the license authorizes, the legislature, out of superabundant caution, concluded the section with the provision that it shall not authorize the licensee to sell "any oleomargarine, butterine or any similar substance, made or colored so as to resemble or be in imitation of yellow butter." To recapitulate, the article which the license authorizes the licensee to sell must "be made and kept free from all coloration or ingredients causing it to look like yellow butter;" it must not be "made or colored in imitation of yellow butter;" it must "not contain any coloration or ingredient that causes it to resemble or be in imitation of yellow butter;" it must not "be made or colored so as to resemble or be in imitation of yellow butter." These are not expressions chosen haphazard. They were evidently selected with care. They show a studied effort to prevent the sale of oleomargarine, which, by reason of the addition of coloring matter, or of the selection or treatment or combination of its component parts, is made to resemble and be in imitation of yellow butter.

We proceed to a consideration of some of the principal reasons urged against the adoption of that construction, and in favor of a construction which will restrict the statute to "artificial coloration" produced by the admixture of some substance which serves that purpose only.

Pennsylvania had a statute, Act of May 21, 1885, P. L. 22, which absolutely prohibited the manufacture and sale of oleo-

margarine. This was held to be constitutional by the Supreme · Court of this state in Powell v. Commonwealth, 114 Pa. 265, which judgment was affirmed on writ of error by the Supreme Court of the United States in Powell v. Pennsylvania, 127 U. S. 678 (8 Sup. Ct. Repr. 992, 1257). But in that case no question of interstate commerce was involved or considered This question arose in Schollenberger v. Pennsylvania, 171 U. S. 1 (18 Sup. Ct. Repr. 757), and it was there held that the act of 1885, to the extent that it prohibited the introduction of oleomargarine from another state and its sale in the original package, was invalid because it was repugnant to the commerce clause of the federal constitution. We remark parenthetically that this decision, of course, did not affect the validity of the law so far as the sale of oleomargarine not brought from another state was concerned, nor did it overturn the decision in Plumley v. Massachusetts. The judgment in the Schollenberger case was rendered in May, 1898, and was followed at the next session of the legislature by the repeal of the act of 1885, at least so far as it was prohibitory of the manufacture and sale of oleomargarine, and the substitution therefor of the licensing and regulating act, of 1899, which in turn was supplanted by the act of 1901. In arriving at a proper construction of the color provisions of the latter act we must presume, especially in view of the prior prohibitive legislation and the decisions under it, that it was not the ulterior purpose of the legislature to make them, in effect, prohibitory of the manufacture and sale of all oleomargarine, while in form not so, nor to enact a law that would be effective as against colored oleomargarine manufactured and sold within the state, but by reason of the commerce clause of the federal constitution, would be ineffectual as against colored oleomargarine manufactured in another state and brought here and sold in the original package. Doubtless their intention was to frame a law that, in its practical operation, would neither be prohibitory of the manufacture and sale of all oleomargarine, nor be in conflict with anything that was decided in the Schallenberger case, or the case of Collins v. New Hampshire, 171 U. S. 30 (18 Sup. Ct. Repr. 768). Thus far we concur with the learned counsel for the defendant; but we cannot give our assent to the proposition that the act of 1901, unless construed as contended for

by them, will be virtually prohibitory of the sale of oleomargarine. To sustain this proposition we must assume that the color of yellow butter is an essential quality or characteristic of oleomargarine, which cannot be prevented except by the omission from the compound of an indispensable constituent. This assumption is neither warranted by the evidence before us nor by facts of which we must, or may, take judicial cognizance. Oleomargarine is an artificial product intended as a substitute for butter. It is not always composed of the same ingredients, nor of the same ingredients compounded in the same proportions, nor are the processes of manufacture identical in all cases. In some the imitation of yellow butter is not produced, in some it is produced, or at least has been, by the addition of coloring matter such as is used in coloring pure butter (see Standard Dictionary, title Oleomargarine), in others by an admixture of a small quantity of palm oil, so small as to accomplish no other purpose (see Cliff v. United States, decided in October last), in still others by the use of certain ingredients prepared in a certain way or compounded in certain proportions. The fact that ingenuity and science have been exerted and developed to such a degree as to render it possible to make a complete imitation of yellow butter, without the introduction of anatto, or of any of the substances of which aniline is the base, or of any similar coloring substances, falls very far short of proving that the act of 1901, unless construed as contended for by the defendant, imposes conditions which, if complied with, will effectually prevent the sale of pure and wholesome oleomargarine.

But it is argued that the construction contended for by the defendant must be adopted, otherwise, the act imposes unwarrantable restrictions upon interstate commerce. We do not concede this proposition; nor do we express any opinion upon its soundness. The sale in this case was not an interstate commerce transaction. But, for the sake of the argument only, let the proposition above stated be conceded, yet it would not necessarily follow that the construction contended for ought to be adopted by the courts. It is a safe and wholesome rule, that wherever a statute is susceptible of two constructions, of which the one would make it unconstitutional, the other constitutional, the latter is to be adopted. But there are limits

beyond which the courts may not go in that direction. The rule " does not warrant the avoidance of unconstitutionality in a statute by forcing upon its language, under construction, a meaning,. which, upon a fair test, is repugnant to its terms: " Endlich on Interpretation of Statutes, sec. 180. We agree with the learned counsel in presuming that the legislature intend to avoid conflict with the provisions of the federal constitution upon that subject, but are constrained by their language to go further, and to conclude that they supposed they were avoiding it by prescribing regulations governing the manufacture and sale of oleomargarine, which, in their opinion would be sustainable by the principles upon which the statute construed in Plumley v. Massachussetts, 155 U. S. 461 (15 Sup. Ct. Repr. 154), was upheld, and yet would effectually prevent the sale of all oleomargarine made or colored so as to be an imitation of yellow butter. If these provisions as to color, construed according to the plain meaning of the words adopted by the legislature to express their will, are not effectual as against oleomargarine so made or colored, which is brought from another state and sold here in the original package, it is not because the legislature did not intend them to be, but because they were mistaken—we do not intimate that they were—in their construction of the clause of the federal constitution bearing upon the subject. The argument based on the supposed inconsistency with that clause of the constitution that will result, if the defendant's construction of the statute is not adopted, while plausible, has failed to convince us that it ought to be adopted. We do not see how it can be adopted without defeating the primary intent of the legislature plainly indicated by their words.

The legislature evidently believed, presumably after a full investigation of the subject, that these provisions relative to the color of the product, in addition to the other provisions relative to the signs to be displayed and the marks and stamps to be put on the packages, were necessary in order to completely prevent deception. This was a legislative question, and it is not within our province to set their judgment aside merely because we may believe that the provisions are unnecessary for the full accomplishment of that purpose, or are unduly severe: " The rule of law upon this subject appears to be that, except

where the constitution has imposed limits upon the legislative power, it must be considered as practically absolute, whether it operate according to natural justice or not in any particular case. The courts are not the guardians of the rights of the people of the state, except as those rights are secured by some constitutional provision which comes within the judicial cognizance. The protection against unwise and oppressive legislation, within constitutional bounds, is by an appeal to the justice and patriotism of the representatives of the people. If this fail, the people in their sovereign capacity can correct the evil; but courts cannot assume their rights. The judiciary can only arrest the execution of a statute when it conflicts with the constitution. It cannot run a race of opinions upon points of right, reason, and expediency with the law-making power: " Cooley on Constitutional Limitations, ch. 7, sec. 4 (7th ed., p. 232). This statement of the general doctrine, and others in the same connection, was quoted by the present Chief Justice, and many Pennsylvania cases sustaining it were cited in Commonwealth v. Moir, 199 Pa. 534. As was said by Mr. Justice HARLAN in Powell v. Pennsylvania, 127 U. S. 678 (8 Sup. Ct. Repr. 992, 1257), so it may be said with equal appropriateness here: " If all that can be said of this legislation is that it is unwise, or unnecessarily oppressive to those manufacturing or selling wholesome oleomargarine, as an article of food, their appeal must be to the legislature, or to the ballot box, not to the judiciary."

Upon mature consideration of the whole question we conclude, that there was ample evidence to warrant the conviction of the defendant, although there was no evidence of the artificial coloration of the oleomargarine by the addition thereto, in the process of manufacture or afterwards, of any substance which had no other function than to cause it to resemble and be in imitation of yellow butter.

All the assignments of error are overruled, the judgment is affirmed and the record is remitted to the court below to the end that the sentence be carried into effect.