# In the Matter of Sheppard's Contested Election.

1. Sheppard was returned elected district attorney; the Quarter Sessions decreed his election invalid, and that Gibbons was elected. Sheppard removed the record to the Supreme Court by certiorari, pending which, by permission of the Quarter Sessions, he filed a petition alleging "arithmetical and clerical errors in the table," on which the decree was based, averring that he had been elected, praying for a re-examination, and that he should be declared elected; the original decree was afterwards affirmed by the Supreme Court, and the Court of Quarter Sessions subsequently made the examination and decreed Sheppard elected. *Held*, that such proceedings were in the power of the Quarter Sessions, although after the term.

2. The Supreme Court has no power to review the merits, and can only

[In re Sheppard's Contested Election.]

bring up the record for special purposes; the power to correct errors is in the Quarter Sessions.

3. The Supreme Court, in affirming the decree, did not confirm it on the merits; it affirmed merely that the Quarter Sessions proceeded in due form of law.

4. The people were not to be ousted of their right to have the officer whom they had elected, by his act.

January 14th 1875. Before AGNEW, C. J., SHARSWOOD, WILLIAMS, MERCUR, GORDON, PAXSON and WOODWARD, JJ.

Certiorari to the Court of Quarter Sessions of *Philadelphia*, at the instance of Charles Gibbons, in the matter of the contested election of Furman Sheppard as District Attorney: Of January Term 1873, No. 197.

In 1868, Furman Sheppard was returned elected district attorney for Philadelphia for three years, at the general election held in October in that year. On the 23d of October 1868, the petition of a number of citizens of Philadelphia was presented to the Court of Quarter Sessions, contesting the election, on the ground that a number of votes had been illegally counted for Mr. Sheppard, sufficient to reduce his aggregate vote below that of his competitor, Charles Gibbons, who, the petitioners averred, was therefore duly elected.

On the 16th of October 1869, the court decreed that Mr. Gibbons had been duly elected. On the 19th of October Mr. Sheppard removed the proceedings to the Supreme Court by certiorari; the writ being brought into the Court of Quarter Sessions on that day. On the 25th of October 1869 Mr. Gibbons was sworn into office. On the 28th of October 1869, Mr. Sheppard, by leave of the court, filed a petition in the Quarter Sessions, setting out the decree, and representing that it was based on "certain principles which were announced in the opinion then delivered," and on a table and estimate embraced in the opinion; this table also was set out in the petition, and showed that Mr. Gibbons had received a majority of sixty-eight votes over Mr. Sheppard.

The petition proceeded:—

"Your petitioner has made a careful examination of the above table and estimate, and has found in it a number of omissions and arithmetical and clerical errors, to the extent of one hundred and twelve votes, showing that Charles Gibbons, Esq., was not elected by a majority of sixty-eight votes, as was adjudged by your honorable court, but that, upon the principles adopted in the said decision and judgment, your petitioner was elected by a majority of not less than forty-four votes.

"Your petitioner's computation is based upon the figures and calculations of the *contestant alone*, without any reference to the respondent's view of the testimony in the case, which figures and computations will be found set forth in the several paper-books of

[In re Sheppard's Contested Election.]

the contestant, and exhibit the petitioner's case in the most unfavorable light in which it can be viewed." * * *

Then follow the omissions and errors alleged, showing the result he had stated.

The prayer was that the court would re-examine and reconsider the count and the judgment entered on it, and declare the true vote, &c.

On. the 4th of November 1869, Mr. Sheppard filed another petition alleging further errors in the count, &c.

On the 3d of January 1870, the certiorari, with the record of the Quarter Sessions, was returned to the Supreme Court.

On the 23d of March 1870, the remittitur from the Supreme Court was filed, with the judgment of the Supreme Court: " Decree affirmed."

On the 28th of March 1870, Mr. Gibbons filed a paper, objecting to any further proceedings on the petitions of Mr. Sheppard :—

1. Because the court on the 16th October 1869 decreed that he was duly elected district attorney.

2. Because he had taken the oath of office on the 25th of October 1869 ; had then entered on the duties of the office and had continued to perform them ever since.

3. And because the proceedings in the case which had been removed to the Supreme Court by certiorari had been affirmed.

After hearing—the opinion of the Court of Quarter Sessions was delivered by Allison, P. J. It was of great length and exhaustive. It concluded as follows :—

* * * " We can claim to have given the case a most careful examination, with all these lights to aid us. In this examination we have adhered firmly to the principles contained in the opinion of the court, which was delivered by Judge Brewster. In nothing have they been varied or departed from. We have confined ourselves to the correction of the account, where figures have been required to be placed in it, in consequence of accidental oversight; with an abandonment of an admitted error in the mode of stating the account in purging a poll, and with the revision of our judgment upon the evidence as to whether votes to be received or rejected are legal or illegal votes.

" The strictest line of proof has been applied to every voter, and the result of the investigation will be stated in summing up the corrected tables of the divisions to which our attention has been directed.

" We have refused credits, which have been claimed in every instance, in which the testimony as to the voters, who were primâ facie illegal, did not show that, at the *time* at which they offered to deposit their ballots, the offer was supported by the proof which the law demands. The vouching by election officers, without making the requisite proof in each case, we rejected.

[In re Sheppard's Contested Election.]

" We hold that to enter upon the list of voters that a voter was vouched for by a person whose name is written upon the list, is not in itself a full compliance with the law. In no case has a vote been counted as legal where the proof showed that a person who was assessed as residing at a place designated upon the assessment list had removed therefrom before the election, unless it was established by evidence that he had not removed from the election division.

" We place to the credit of Mr. Sheppard thirty of the thirty-six votes of naturalized citizens, which were refused because the voters held certificates of naturalization issued by the Supreme Court. This credit of thirty-six is reduced by six, because it is admitted by the petitioner. The full credit was given to Mr. Fox in the decision of the court which was made in October last. The thirty-six votes were allowed because we regarded the polls, as to those voters, closed against them. They offered to vote, and were in place to be challenged upon every ground of qualification, but were turned away from the polls upon the single objection that they had been naturalized in the Supreme Court. The proofs were that they intended to vote for the petitioner. As to these voters, Judge Brewster remarks : ' It is established by thirty-six persons that their votes were rejected, although they were duly naturalized, and that they would have voted for the respondents.'

" Beyond all question these votes should now be credited to the incumbents. The papers they produced were genuine certificates, issued by the prothonotary under the seal of the highest court of our state. No other tribunal should or can impeach its judgments, and they established the right of each of these witnesses to his vote, if otherwise qualified. And if they were not otherwise qualified, under the peculiar circumstances which surrounded them, we hold that this ought to have been shown by the contestants.

" It was not pretended but that the admission of these votes was exceptional, and rested upon a different ground from that upon which other votes had been credited to the incumbents. We decided to place them in the count, unless they were shown to be illegal, giving to them all the presumption which belongs to those whose legal prima facies are established. Of the hundreds who were claimed by the incumbents as wrongfully rejected, for the same reason, thirty-six are all who were called, and the fair presumption is they were all who could,. with safety to the incumbents, be called to testify that they intended to vote the Democratic ticket. These thirty-six were allowed. The rest of this claim, which, as Judge Brewster remarked ' was founded on multiplication of guesses,' we rejected. In our judgment no good reason has been presented which would require us to alter our opinion as to

these votes. The oversight as to this credit, to the number of thirty votes, is now allowed to Mr. Sheppard.

" In the Eighth division of the Ninth Ward there was error in charging fourteen illegal votes too many to Mr. Sheppard. The testimony shows that nineteen fraudulent and fourteen unassessed votes were polled during the last three hours. The vote of these hours was.purged to the number of forty-seven. It should have been thirty-three. There was charged fourteen fraudulent votes in addition to the nineteen, but the evidence fails to satisfy us of the correctness of this conclusion. On the contrary, we are convinced that they are included in the nineteen false personations of the three hours, the vote of which has been purged. There is an admitted error in Mr. Sheppard's favor of five votes in the Sixteenth division of the Twentieth Ward.

" The laborious portion of the duty which we have been required to perform was the labor of re-examining and carefully weighing the testimony as to the individual votes which were claimed by the petitioner, in a readjustment of the account of debit and credit, in the Eighth division of the Ninth Ward, the Seventh division of the Seventeenth Ward, the Fourth division of the Twenty-fifth Ward, and in the Sixth division of the Seventeenth Ward.

" The credits which we give to Mr. Gibbons consist of error in striking out the hourly return from the Second division of the First Ward of seven votes ; and a similar error in the Tenth division of the First Ward of eleven votes.

" We reduce the charge against him of fifty-two illegal votes to forty-one, a credit of eleven votes.

" To this is to be added the credit of six, deducted from the thirty-six votes of naturalized citizens credited to Mr. Fox.

" We do not allow the credit of five votes claimed by Mr. Gibbons in his statement submitted to the court, of an error which, Mr. Gerhart states, is to be found on the tally-list for the ninth hour of the Sixth division of the Seventeenth Ward. An examination of the tally-list shows there is no such error.

" The result of our investigation is stated as follows :—

" If we confine ourselves to the petition and do not look at anything outside of it, Mr. Sheppard's majority is thirty-five votes. But to restate the account on the basis of mistakes of omission and overcharge, as well as errors in purging the polls, it will stand thus :"— * * *

[Then follows a statement showing the election of Mr. Sheppard by a majority of thirteen votes.]

The court therefore decreed : " That the said Furman Sheppard received the greatest number of the legal votes cast at the election held in the city and county of Philadelphia on the 2d Tuesday of October 1868, for the office of district attorney, and was duly

[In re Sheppard's Contested Election.]

elected to the said office, and that the order and decree of the 16th of October 1869, be annulled and set aside."

Mr. Gibbons removed the record to the Supreme Court by certiorari. He assigned for error that the court erred:—

1, 2. In allowing the petitions of Mr. Sheppard to be filed after the writ of certiorari sued out by him had been filed in the court below.

3. In the decree of May 3d 1870, that Mr. Sheppard had received the largest number of votes for district attorney; in annulling the decree of October 16th 1869; the decree of May 3d 1870, "having been entered after the expiration of the term at which, by the order and decree of October 16th 1869, it had been adjudged and decreed by the said court that, * * * Charles Gibbons was duly elected to the office of district attorney, and after the said last-mentioned judgment and decree had been affirmed by the Supreme Court on a writ of certiorari sued out by the said Furman Sheppard, whereby the record of the said judgment and the proceedings whereon it was founded had been removed to the Supreme Court, and after the record of the decree of the Supreme Court, affirming the judgment and decree of the court below, had been remitted to the court below."

*J. E. Gowen* and *R. C. McMurtrie*, for certiorari.—The certiorari was a supersedeas and the subsequent proceedings were erroneous: Ewing *v.* Thompson, 7 Wright 372; Patchin *v.* The Mayor, 13 Wendell 664; Gardiner *v.* Murray, 4 Yeates 560. The petitions were waived by the subsequent proceedings on the certiorari. The petitions proposed to correct errors of fact, which cannot be done after the affirmance: Burleigh *v.* Harris, 2 Strange 975; Lambell *v.* Pretty John, 1 Id. 690; McMurray *v.* Erie, 9 P. F. Smith 223. The decree could not be altered after the expiration of the term: Commonwealth *v.* Maloy, 7 P. F. Smith 291; Caltin *v.* Robinson, 2 Watts 373; Stephens *v.* Cowan, 6 Watts 511; Ullery *v.* Clark, 6 Harris 148; Brush *v.* Robbins, 3 McLean 486; Medford *v.* Dorsey, 4 Wash. C. C. R. 433.

*G. W. Biddle* and *B. H. Brewster, contra.*—Such a proceeding as this should not be entertained, the office having expired: Tapping on Mandamus 15; Cole on Crim. Information 138. The court below had the right to re-examine the calculations, the certiorari bearing solely on the record: Election Cases, 15 P. F. Smith 20. A judgment in some cases may be modified after the term: Riegel *v.* Wilson, 10 P. F. Smith 388; Kalbach *v.* Fisher, 1 Rawle 323; Castle *v.* Reynolds, 10 Watts 52; Murray *v.* Cooper, 6 S. & R. 126; Rhoades *v.* Commonwealth, 3 Harris 276; Cochran *v.* Eldridge, 13 Wright 371.

[In re Sheppard's Contested Election.]

Chief Justice AGNEW delivered the opinion of the court, February 1st 1875.

The application to this case of the principles governing the controversies between individuals who are affected by their own acts, is a source of error. Anological reasoning misleads, when true analogy is wanting. The proper character of this case must be stated, in order to determine it correctly. It was a contested election, a proceeding to redress a public wrong. Under the Act of 3d May 1850, contested elections for district attorney are to be decided in the manner provided for contesting the election of county officers: 1 Bright. Dig. 490. The Act of 2d July 1839 gives jurisdiction to the Courts of Quarter Sessions to "*hear and determine*" all cases in which the election of any county or township officer may be contested: 1 Bright. Dig. 572. The proceeding is on the petition of at least twenty qualified voters, complaining of an undue election or a false return. The petition in this case will be found in 15 P. F. Smith 22. It sets forth various frauds and illegal practices, alleged to be done with intent to hold an undue election, and to prevent an honest expression of the popular will at the election. In the opinion on page 29, it is said: "The contest of an election is a remedy given to the people by petition for redress, when their suffrages have been thwarted by fraud or mistake. The instituted tribunal is the Court of Common Pleas, or Quarter Sessions, as the case may be. By the Acts of July 2d 1839 and February 3d 1854 the court is to proceed upon the *merits* of the complaint, and determine *finally* concerning the same according to the laws of this Commonwealth. No bill of exception is given to its decisions, nor appeal allowed, and its decisions are final. Consequently the Supreme Court has no jurisdiction over the subject."

The Supreme Court thus having no power to review the merits, it can only, under its general power to supervise the proceedings of inferior tribunals, bring up the record for this special purpose. The power to correct errors in the judgment in this case belongs to the Quarter Sessions alone. To it is the cause of the people committed, and it alone can determine whether the popular will has been defeated by fraud or unjust practices.

Now, it is evident that when this court brought up the record of the Quarter Sessions by certiorari, it was for no purpose of correcting the findings or decree, and when it affirmed that finding or decree, it did not confirm it on the merits, for the plain reason it had no power to inquire into them. It simply affirmed that the Quarter Sessions had proceeded in due course of law. The duty of determining who was the legally elected district attorney demanded a truthful and faithful performance of this function, by the only lawful tribunal, and if it made a mistake by which the will of the people was actually falsified, instead of being ascertained,

[In re Sheppard's Contested Election.]

as the law required, this very duty demanded that the court should correct its own mistake in due time.

It is well settled that elections of the people should not be defeated by mere informality, and hence the law declared that the court " should proceed upon the *merits* of the complainant." This being the peculiar province of the Quarter Sessions, if it refused to correct its own palpable mistakes of calculation, which defeated the popular will, it would violate the very spirit and intent of the law which required it to ascertain the *merits*. Now what were the mistakes the court below had made? It had, by mere accident omitted to credit Mr. Sheppard with thirty-six votes of naturalized citizens which it had allowed to be legal. It had also made the mistake of deducting the *purged* votes from the majority of Mr. Sheppard, instead of deducting them from the whole poll before the majority was struck. Correcting these errors of calculation, Mr. Sheppard was actually elected as well as returned.

The duty of correction is admitted, but it is said it must be done while the record is in the breast of the court and therefore before the end of the term. This is the conceded rule; but does it apply to this case? Clearly not : it is a case of suspended power only. The application was made during the term and while the record was yet in the breast of the court, and capable of correction. The court was advised of its mistakes, and entertained the application by receiving and permitting it to be filed. But its hands were then tied, its power to act suspended by the mandate of a superior court, to send up its record for alleged errors of procedure. It then could proceed no further, without disrespect to the superior tribunal. Here was the clear distinction. It was but an involuntary suspension of its undoubted power, not an extinguishment. The cause was not removed by an appeal, which *ended* its inquiry into the merits. The superior court acquired no jurisdiction over the merits, and therefore its writ could not deprive the inferior court of its rightful power to correct its own mistakes. For the same reason the decree of the superior court, which it is said ratified and affirmed the false finding of the inferior court, did not affirm its falsehood. It could neither inquire into the merits of the petition for the correcting of mistakes nor strike them off, because they were received and filed in time.

There was, therefore, but a suspension of the power of correction in the Quarter Sessions, which was *resumed* when its record was returned. The term had passed only in point of time, not of judicial cognisance. It was not an attempt to correct an error of judgment after it had passed finally into the record. It was no rejudgment of the merits, when judgment had gone by. Such attempts are clearly illegal, as shown in the case of the Commonwealth *v.* Maloy, 7 P. F. Smith 291, and the error was not saved in that case by the illegal custom of entering immediately a rule to

[In re Sheppard's Contested Election.]

show cause why the sentence should not be modified or set aside. Under such a practice, no judgment could ever be final. But when a rightful petition for the correction of a mistake is received, on what principle of sound reasoning does the removal of the record by a higher authority for another and a rightful purpose, merge the pending petition for ever, and drive justice from her seat? It is only by false reasoning and ill-fitting analogies such a conclusion can be reached. It is said the suspension was Mr. Sheppard's own act and he is estopped. True, it was his act, and it was his right also. He believed the proceeding which unseated him to be irregular. He failed, but his mistake did not oust the right of the people to have their own officer elected by them. Their right to have the merits of the election truthfully declared by the court was not barred by the suspension caused by his writ, from an appeal to the only tribunal having power to correct the mistake; they were not estopped by his act. The power of the court, though first moved by his petition, was not arrested in its motion because he failed. · The court itself, as the chosen tribunal of the people, was bound to correct its errors when made known to them, in any way. It is a false analogy to say he elected his remedy, and therefore the court cannot exercise its inherent power to do right. It is a false analogy to say that the public redress is to be determined by rules applicable only by a private controversy. It is a false analogy to liken this case to the attempt of a court to rejudge its judgment after the term was passed. This was no such attempt. Here was a manifest mistake of calculation shown by the notes of the judge.

As remarked by C. J. Lewis, there is a great difference between reversing a judgment and correcting a clerical mistake in entering it: Smith v. Hood, 1 Casey 220. "It is doubtless true (remarks Judge Kennedy) that after the end of the term in which the court has rendered judgment upon a case stated on a general or special verdict from which an appeal may be taken by writ of error, or otherwise, it cannot alter or change it with a view to correct what the court upon further reflection may consider an error therein, and yet it would be going too far to say that such court may not afterwards and before any proceeding has been had upon the judgment, correct a mere mistake that has arisen in entering it differently from what was intended and perhaps directed:" Stephens v. Cowan, 6 Watts 513. And said Judge Tilghman, one of the safest of judges: "But although it had not been during the term, it would not follow that the court had exceeded its power, for amendments have been allowed, not only after the term, but even after error brought:" Ordroneaux v. Prady, 6 S. & R. 511. The same excellent judge said also, in Bailey v. Musgrave, 2 S. & R. 220: "Where the object of the amendment is to do justice,

[In re Sheppard's Contested Election.]

courts are vested with extensive powers, not only by statute, but by the common law."

Judge Yeates remarked in the same case: "The strictness which formerly obtained in the granting of amendments, is said in our books to be almost entirely eradicated." Still later, Chief Justice Gibson has said: "Not only has every court the power, but it is its duty to amend a clerical error, which stands in the way of justice:" Owen *v.* Simpson, 3 Watts 88.

The whole system of amendments is but an exercise of the power of correction to reach substantial justice. It is the every day practice of this court to disregard formal errors or mistakes that do no injustice. The end is the same that justice be not put to shame by her own ministers. The books are full of corrections, and the legislature has expanded the power from time to time.

Names may be altered, parties added or struck out, the forms of action may be changed, two judgments may stand where only one stood before, the bar of death is removed from estates in joint contracts, and in some torts. Even the traditional sacredness of criminal procedure has been invaded by the legislative command, and indictments may be amended in certain respects which before were forbidden. And it may well be asked, why should not those be trusted to correct their own mere mistakes, who are intrusted with the greater power to decide the merits?

This beneficial power may be illustrated by a few cases found in the books. Eight years after judgment, and after the defendant's death, the court permitted amendment by entering judgment *nunc pro tunc :* Murray *v.* Cooper, 6 S. & R. 126. In Ordroneaux *v.* Prady, *supra,* a plaintiff was permitted to amend his declaration after judgment by altering the time of the assumption. See also Bailey *v.* Musgrave, *supra.* In Stephens *v.* Cowan, 6 Watts 511, Judge Young, after the court rose in Indiana county, by letter from Ebensburg, stating that he had entered judgment by mistake for the plaintiff, directed the prothonotary to "set the error right by entering judgment for defendants." On error this was maintained. After a lapse of forty years the court permitted a venditioni exponas to be amended to include an executory devise levied on, but not recited in the venditioni exponas : De Haas *v.* Brown, 2 Barr 335. On the trial of an ejectment, under sheriff's deed, an amendment of the venditioni exponas was permitted, by inserting the name of a defendant from the præcipe, and the sheriff's sale thus passed the title: Sickler *v.* Overton, 3 Barr 325. A judgment entered by mistake upon a warrant of attorney for a less amount than the obligation called for, was amended after execution executed, and an alias awarded to collect the balance : Smith *v.* Wood & Co., *supra.* An omission in a levari facias of the command to levy the debt, was permitted after a sheriff's sale, and on writ of error the amendment was held to be good: Peddle *v.* Hollins-

[In re Sheppard's Contested Election.]

head, 9 S. & R. 277. A writ of fi. fa. on which land was levied and sold, was in its entire body made out in a different case, and only the endorsement was right, and it was held to be amendable and the title passed : Owen *v.* Simpson, *supra.* In Fitzgerald *v.* Stewart, 3 P. F. Smith 343, a verdict for damages in slander was rendered for plaintiff and a motion for a new trial and in arrest of judgment entered. The plaintiff afterwards died, and her death was suggested, and a rule was entered to show cause why the writ and action should not abate. After several terms the rules were discharged and a judgment entered *nunc pro tunc* as of the term of the verdict when the plaintiff was alive. This action of the court was sustained. Thus when the plaintiff's right of recovery was actually gone, in point of time, the power of the court was exerted through the legal fiction of a *nunc pro tunc* to prevent a failure of the verdict. In Ullery *v.* Clark, 6 Harris 148, we have an illustration of the difference between the correction of a mistake and an alteration of the judgment itself. The language of Judge Kennedy, in Stephens *v.* Cowan, was adopted, and it was held that a judgment without costs, could not, two years afterwards, be corrected to stand as a judgment with costs. The question of costs was one of right and the court could not correct its error of judgment by a subsequent order. This is the true distinction. But a court powerless to correct its mere mistake of calculation, or the misprisions of its officer would be stripped of half its power to perform its true functions.

Upon the whole, we can discover in this record no excessive exercise of power by the court below which demands correction, especially at this late day, when the term of office has expired and the people have no contest and no cause for redress.

The proceedings are therefore affirmed.