# Commonwealth *v.* Duffy, Appellant.

*Criminal law—Conspiracy—Evidence—Hearsay—Motion to strike out.*

1. On the trial of an indictment for conspiracy it is reversible error for the court to admit as substantive evidence of an existing conspiracy, separate and disconnected acts and declarations of persons not defendants, nor shown in any way to have been connected with them, and made in their absence without the knowledge of any of them. Such evidence should not only not be admitted in the first instance, but it should be stricken out without motion, counsel should not be permitted to comment upon it, and the jury should be directed to wholly disregard it.

*Criminal law—Practice—Special exception—Nunc pro tunc.*

2. Where the trial judge in a criminal case grants, after the trial, a special exception to parts of the charge, the commonwealth has no right to an exception to such special order of the court.

3. Such special exception is within the discretion of the trial judge,

and if properly allowed carries the charge up with the record for the consideration of the appellate court. Since the Act of May 11, 1911, P. L. 279, there is statutory authority for allowing the exception after verdict.

*Criminal law—Reasonable doubt—Charge.*

4. When a reasonable doubt within the meaning of the law and· under the evidence, exists, it is the property of the defendant, and must result in an acquittal. It is reversible error for the trial judge not to give sufficient and proper instructions in regard to reasonable doubt.

Argued Oct. 20, 1911. Appeal, No. 121, Oct. T., 1911, by defendants, from judgment of Q. S. Phila. Co., April T., 1910, No. 288, on verdict of guilty in case of·Commonwealth v. Thomas J. Duffy, John J. Lynch, John D. Sweeney, Charles Shobert and Richard Debussey. Before RICE, P. J., HENDERSON, MORRISON, ORLADY, HEAD, BEAVER and PORTER, JJ. Reversed.

Indictment for conspiracy. Before WILLSON, P. J.

The facts are stated in the opinion of the Superior Court.

When Solomon Cole was on the stand he was asked this question: "Q. When they took you to the desk, what did they say or do? A. One of the men said, ' Don't slate them.' Q. Said what? A. Don't slate them."

Mr. Scott: "Q. Where was this?"

Mr. Taulane: Up at the station house.

Mr. Scott: I object unless the defendants were present.

The Court: I cannot separate the conspiracy charges. The indictment charges conspiracy between the defendants named and other persons not known to the grand jury.

Mr. Scott: I take it, before they could establish the statement made in the absence of the defendants, the conspiracy charge, they have to first establish there was a conspiracy.

The Court: No, sir, they can only establish conspiracy by building· it up in detail. You cannot establish conspiracy, unless in a very rare case, if there was ever such a case, in which it could be shown that the defendants got

together in the presence of the witness and agreed to enter into a conspiracy.

Mr. Scott: There is no question about your Honor's law, unless it is shown that the statement was made by one of the co-conspirators.

The Court: I will admit the evidence. I cannot tell whether it will have any bearing or not.

Exceptions noted for defendants by direction of the court. [1]

Mr. Taulane: "Q. You got to the station house and you are now at the desk at Front and Westmoreland? A. Yes, sir. Q. Tell the court and jury just what took place, what this officer said, or that officer said, and what you all said. A. They did not say anything else."

Mr. Scott: I object to the question.

The Court: That is the same question.

The Court: What do you mean by these three people?

Mr. Taulane: The three men under arrest.

Objected to. Objection overruled. Exception noted for defendants by direction of the court.

Mr. Taulane: "Q. You are taken to the desk? A. Yes, sir, taken to the desk and they did not slate us. Q. They slated you? A. No, sir, they did not. Q. Why did they not slate you, if you know?"

Objected to.

The Court: He may ask what was said.

Mr. Taulane: "Q. What was said there about slating you? A. The man in the patrol said, 'Don't slate them.' Q. The man in the patrol said that? A. Yes, sir. Q. What do you mean, a patrol officer, or who? A. An officer. Q. The officer said, 'Don't slate them.' Then what did they do? A. Took us back. Q. They did not slate you?"

Mr. Scott: He did not say that.

Mr. Taulane: "Q. Did they slate you, as far as you know? A. No, sir. Q. When you got back there, what happened? A. When we got back there, one of the officers in the patrol said——"

Mr. Scott: I object.

The Court: He may state it.

Exception noted for defendants by direction of the court. [2]

Mr. Taulane: "Q. What did this officer say as you approached the station house? A. He said, 'Don't take them in the front way. Take them around the back way.' Q. Did he give any reason? A. No, sir, he said the lieutenant said so. Q. The lieutenant said so? A. To bring them around the back way."

Edward McKenzie was asked this question:

Mr. Taulane: "Q. Go on. A. Along about three o'clock in the afternoon a gentleman came around to the cell and he says, 'What are you fellows' names, if any of your friends should happen to come after you that we can give them an explanation.'"

Mr. Scott: I object to that.

Mr. Taulane: It is a part of the conspiracy. These men who had the men in the station house are just as much in it.

Objection overruled. [3] Exception noted for defendants by direction of the court.

"A. We gave them our names. Q. Was that the first time you were asked for your names? A. That is the first time. Shortly after that——"

Daniel D. Test testified as follows: "Q. Whom did you see when you got to the station house? A. The house sergeant, and there were two or three officers. Q. Which house sergeant? A. I don't know. He was a sergeant whose name I do not know. There was a special officer— one of the special officers—was the only man I know. He took no part in the conversation. We asked them about these men——"

Mr. Scott: I object to this conversation.

Mr. Taulane: This is the very gist of the commonwealth's case. If these men were taken to the station house, not slated, information refused, simply had been carted away, it was evidently all a part of the same conspiracy, and I want to show the efforts made by the wit-

ness, who was a citizen, to go there and find out about these men and get the ordinary discharge.

Mr. Scott: I object to any conversation the witness had with some person.

Mr. Taulane: In charge of the station house.

Mr. Scott: I object to any conversation that the witness had with any person not a defendant and there being no evidence of any connection with the case.

Mr. Taulane: To be followed by conversations of similar character the next day with the defendant in the case.

The Court: " Q. Were any of the defendants there at the time? A. No."

The Court: The substance of the allegation here is that the police authorities in control at this police station combined for the purpose of accomplishing certain evil and criminal results. I understand the witness to say that somebody in control of the office, some officer, was the one with whom he had the conversation. The point is not one upon which I feel entirely clear; however, I will admit the evidence.

Exception for the defense noted by direction of the court. [4]

The Witness: " The house sergeant with whom I talked said they knew nothing about it. Dr. Golden and I withdrew. We thought there was nothing more to do. I then called up the Public Ledger office——"

The court charged in part as follows:

[All that is necessary to establish satisfactorily and clearly in a case of conspiracy is, by evidence which may be scattered, which may relate at one time to one, two or more defendants, and at another time to another—all that is necessary is to show that the men charged were in point of fact, in the belief of the jury, working to accomplish a certain wicked end. If that is shown, then all is shown that is necessary in order to establish the charge of conspiracy. And, in this particular case, the question is, does the evidence show that?] [5]

[The law does not say that a jury must be able to say, "We know that man is guilty." But the law does say, that the jury must be able to say, "We sincerely believe upon the evidence that the man is guilty." And a juryman has no right, for the purpose of evading responsibility or acting a cowardly part, to say, well, I doubt as to whether the man is guilty.] [6]

Verdict of guilty, upon which the court sentenced each of the defendants to undergo imprisonment in the Philadelphia county prison for the term of one year. Defendants appealed.

*Errors assigned* were (1–4) rulings on evidence, quoting the bill of exceptions; (5, 6) portions of charge as above, quoting them.

*John R. K. Scott*, with him *William T. Connor* and *George S. Graham*, for appellants.—In support of the general and well-established rule that hearsay evidence is wholly inadmissible, are the cases of: Sayres v. Com., 88 Pa. 291; Ranck v. Brackbill, 209 Pa. 499.

In the present case, the declarations and acts which were shown by the commonwealth of persons other than the defendants said or done in the absence of these defendants are the acts and declarations of persons clearly strangers to the defendants, in no way acting in concert or in privity with them, and as such they must be held to be in the nature of hearsay, and clearly inadmissible.

The charge was erroneous as to what was a conspiracy: United States v. Frisbie, 28 Fed. Repr. 808; Com. v. Waterman, 122 Mass. 43; Com. v. Haines, 38 Leg. Int. 53; Com. v. Zuern, 16 Pa. Superior Ct. 588; Com. v. Brown, 23 Pa. Superior Ct. 470; Com. v. Stovas, 45 Pa. Superior Ct. 43.

There was error in the charge to the jury with respect to the doctrine of reasonable doubt: Com. v. Devine, 18 Pa. Superior Ct. 431.

*Joseph H. Taulane*, assistant district attorney, with him

*Samuel P. Rotan,* district attorney, for appellee.—On the trial of a charge of conspiracy, it is within the discretion of the trial judge to admit the admissions and declarations of co-conspirators prior to the establishment of the conspiracy: Com. v. Bumm, 19 Philadelphia, 530; Hanbest v. Heerman, 2 Walker (Pa.), 471; O'Brien v. Keefe, 175 Mass. 274 (56 N. E. Repr. 588); Com. v. Donnelly, 40 Pa. Superior Ct. 116; McCarney v. People, 83 N. Y. 408; U. S. v. Gardner, 42 Fed. Repr. 832.

Whether the patrol officers were co-conspirators or not, no one can doubt that they were the agents of Lieutenant Lynch and the other defendants in executing the conspiracy: American Fur Co. v. U. S., 27 U. S. 358; Cliquot's Champagne, 70 U. S. 114; State v. Dahlquist, 115 N. W. Repr. 81.

A trial court cannot be convicted of error in merely failing to enlarge on questions of law charged upon generally where counsel makes no request for additional instruction: Com. v. Pacito, 229 Pa. 328; McMeen v. Com., 114 Pa. 300; Com. v. Minney, 216 Pa. 149; Com. v. Caraffa, 222 Pa. 297.

The definition of reasonable doubt was sufficient: Com. v. Harman, 4 Pa. 269.

OPINION BY ORLADY, J., March 1, 1912:

This defendant and five others were convicted of conspiracy in falsely imprisoning Edward McKenzie, Solomon Cole and Garret Welsh, who had been appointed watchers and division workers of a political party in the seventh ward of Philadelphia for the general election of November, 1909.

Thomas J. Duffy was the division leader of the dominant party; John J. Lynch, Charles Shobert, John D. Sweeney and Frank Shields were lieutenant, street sergeant and patrolman of the 19th, or Lombard Street, Police District Station House, in the seventh ward of the city; Richard Debussey was a resident of the district. On the trial of the case, Shields was found not guilty, and the

others, after a motion for a new trial had been refused, were sentenced to one year in the county prison and to pay the costs of prosecution. Each of the convicted defendants brings his separate appeal to the court.

The case is rightly described by the court and counsel on each side as being of exceptional importance to both the commonwealth and the defendants. We heartily concur with the learned trial judge in what he says in his charge to the jury, as to the imperative necessity for honest elections and a full and free opportunity to express opinions on political issues, unrestrained by any coercion, as being essential to the maintenance of our government and the protection of our rights and liberties, and that, if in any case it appears to the satisfaction of a jury that those who are intrusted with the preservation of the public peace have prevented honest elections, or the unrestrained exercise of individual judgment in voting, such men ought to be convicted and punished severely.

The defendants are charged with having entered into a conspiracy for the purpose of putting three men in prison, so as to keep them away from their fellow citizens, and from exercising their rights as party watchers at the election, and as individual electors. The only question before us is, was the trial which resulted in their conviction free from reversible error? If it was, then all that was so forcibly stated by the learned trial judge aptly applies. If it was not, then, as in the case of every other erroneous trial, that error should be corrected by setting aside the judgment, and remanding the record back to the court for another trial.

The facts relied on by the commonwealth are substantially as follows: A few days prior to the general election of 1909, Duffy, the division leader of the dominant party, endeavored to induce McKenzie, who was an active representative in the division of another party, to withdraw his opposition to the dominant party ticket, and assist in carrying the division for that party. Failing in this, Duffy then threatened to have McKenzie arrested and sent to

the House of Correction. On the evening of the day preceding the election Sergeant Shobert, and officer Shields appeared at McKenzie's house, and after McKenzie had been pointed out to them by Debussey, they, without warrant arrested McKenzie and took him to the 19th District Police Station, which was directly opposite McKenzie's house. Cole was arrested by another policeman without a warrant, and taken into the same station. Welsh was arrested by another officer without a warrant, and taken to the same station.

Lynch was the lieutenant in charge of this station house, and directed that the three parties be put in a cell. Soon thereafter, a patrol wagon was driven to the back entrance of the station, and the three men were removed in it to the 30th District Station House,—in a distant part of the city. No written charge had been preferred against any one of them at the 19th Station, nor was any record made there of the arrests. They were not "slated" at the 30th District Station. About four o'clock of election day, Cole, Welsh and McKenzie were brought back to the 7th & Lombard Station and were released a short time before the closing of the polls that evening.

It is but fair to say, that every material fact relative to the conspiracy of these defendants was unequivocally denied by them, and that there was positive proof that these three parties had been arrested for a breach of the peace— a riotous disturbance—which brought a large number of persons about the building. By reason of the crowded and unsanitary condition of this station, the three prisoners were ordered to the 3d District Station House which is an adjoining district, but on account of the excitement incident to the arrest and to the mistake of the driver of the patrol wagon, they were taken to the 30th District.

It is urged by the appellants that the verdict was due in a very large degree, if not entirely, to the admission of the evidence recited in the assignments of error and to the charge of the court.

The questions raised may be considered under two

heads: first, the alleged error of the trial judge in admitting the evidence covered by the first four assignments of error, and second, to the instructions given to the jury.

The objections to the admission of the evidence offered by the commonwealth by the witnesses Cole, McKenzie and Test may be considered together.

Cole was permitted to testify that, after his arrest he was taken to the station house of the 30th District, where "One of the men said, Don't slate them," "an officer in the patrol said, ' Don't slate them,' " and further—this officer said "' Don't take them in the front way, take them around the back way ' " "he said the lieutenant said so."

McKenzie was permitted to testify, that while he was confined in a cell in the 30th District Station House, "A gentleman came around to the cell and he says, ' What are you fellows' names, if any of your friends should happen to come after you that we can give them an explanation.' This was the first time we were asked for our names."

Test was permitted to state that, when he called at the 19th District Station House to make inquiry for Cole, "the house sergeant with whom I talked said that he knew nothing about it."

Objection was made promptly to the admission of each of these statements for the reasons given in the assignments. The district attorney urged that these represented the very gist of the case; that this whole procedure was evidently a part of some conspiracy, and offered, that the testimony would be followed by conversations of a similar character with the defendants.

It was conceded that none of the defendants were present when any of the above directions were given, and that at that stage of the trial none of the defendants had been shown to have acted together, or in furtherance of a common purpose. In admitting the testimony of Cole, the trial judge stated—the substance of the allegation is, that the police authorities in control of the 7th & Lombard Station combined for the purpose of accomplishing certain evil and criminal results—I understand the witness to say

that somebody in control of the office, some officer, was the one with whom he had the conversation. The point is not one upon which I feel entirely clear; however, I cannot tell whether it will have any bearing or not.

The supplemental proof that was proffered by the commonwealth when it was received, was not furnished. No relation of co-conspirator or agent was shown to exist between any of the defendants, and the persons designated as, "the police officer in the patrol wagon," "the house sergeant," "somebody in control of the office," "the gentleman who called to make inquiry of Cole," were not identified. Their names were not given, no particular meaning was suggested of the expression—"don't slate them," or any proof that it had any significance, or that it was an unusual or irregular method, or out of the ordinary way to receive prisoners by the back way, or at the back instead of the front door. It was not shown what lieutenant gave the order complained of. It was purely hearsay evidence without giving any authoritative source.

It is not enough for counsel to aver that the facts are as he states them—they must be developed by proof. These statements were offered and received as substantive evidence of an existing conspiracy, while in fact they were but statements of the witnesses attributed to unnamed and unidentified strangers. The district attorney urged that "It is a part of the conspiracy—these men who had the men in the station house are just as much in it. If these men were taken to the station house, not slated, information refused, simply carted away, it was evidently all a part of the same conspiracy." And on argument of this appeal, it is contended "That not only the appellants, but all others, whether mentioned by name in the bill of indictment or not, who aided in carrying out of the conspiracy, were co-conspirators with the appellants."

The trial judge did not so view the case, as, in his charge, he says, "I do not see any evidence in the case which would justify you in coming to the conclusion that some one of these defendants was guilty of a conspiracy with somebody

else, who has not been named, . . . . it must have been a conspiracy in which some of the defendants, if not all of them took part." And the court below, in refusing a new trial, say, "We think that the trial judge had, under the averments of the bill, the right to assume, as at the trial when this evidence was offered, that it would be duly connected with the charge against the defendants, and to admit it in anticipation that the joinder of the parties to whose conduct it relates in the conspiracy charged against the defendants would be duly shown. We are not prepared to say that such a connection on the part of the persons above referred to was not shown by the evidence; although in his charge the trial judge intimated to the jury quite clearly his own doubts on that point."

Two questions are raised in regard to the effect of the admission of this testimony 1, it is contended that it was harmless error, 2, that no motion was subsequently made by the defendants to strike it out.

It is quite correct to say that, the appellant must not only establish the existence of an error in the proceedings below, but that the error has tended to his injury. It must appear that an answer was received which tended to injure the case of the appellant: Com. v. Kay, 14 Pa. Superior Ct. 376; Com. v. Railroad Co., 23 Pa. Superior Ct. 235; Allegheny v. Nelson, 25 Pa. 332; Cox v. Wilson, 25 Pa. Superior Ct. 635; Com. v. Lenousky, 206 Pa. 277; Dunham v. McMichael, 214 Pa. 485.

We cannot measure the weight the jury gave to these hearsay declarations, but it is apparent on reading this record that each one of these statements touched the heart of the case, and would have a very persuasive effect in establishing a conspiracy between the parties named in the indictment with others who are not named therein—the very thing the learned trial judge stated to the jury—there was, however, no evidence on which such a finding could be justified. These separate and disconnected acts and declarations of persons not defendants, nor shown in any way to have been connected with any of them, made in

their absence without the knowledge of any of them, would reasonably and naturally have considerable, if not determining weight.

There was no attempt to show that the men in the patrol wagon or in the 19th District Station House acted under orders from Lieutenant Lynch. If the facts were important in establishing the conspiracy, the alleged agents should have been called. Hence, no proof of agency having been established, the theory of the commonwealth failed.

As to the second proposition, there is an apparent conflict in the practice in our own courts and in the decisions in the different states. We prefer to decide the question in the light of our own authorities.

The commonwealth contends that unless a motion is made to strike out the objectionable testimony, even if a valid exception has been taken to its admission, that the error is waived. It is a close and narrow technicality (which in the opinion of the writer is not sound even technically), especially so where personal liberty and a fair trial are involved, as before the jury, a defendant is entitled to the benefit of every reasonable doubt—it is described as his property and that he cannot be deprived of it. The same interpretation should be given to a rule—if it exists— of doubtful merit, where the incompetency of the evidence is so clear and it is of such a prejudicial character. The evidence was admitted without condition that it would be withdrawn or stricken out unless followed by other supporting testimony. Had the defendant's counsel made the suggested motion at the close of the testimony, it is evident from the language of the court that it would not have been granted. Does the value of the exception regularly allowed, depend on such a formal motion?

It was held in Com. *v.* Crossmire, 156 Pa. 304, that the offer of evidence before a jury, which the evidence fails to sustain, and its subsequent withdrawal, are matters which rest largely in the discretion of the trial court, and the exercise of this discretion will not be reviewed except in a

COMMONWEALTH *v.* DUFFY, Appellant.     357

case of abuse.  As this record is presented we may well treat the exception to this testimony as if a formal motion to strike out had been made and overruled.

The statements of one not satisfactorily shown to have been in privity with the party are irrelevant when offered against him as declarations of a privy: 16 Cyc. 1202. That which gives the crime of conspiracy its distinctive character is unity of purpose, unity of design, focalization of effort upon a particular project by the person named in the indictment: Com. v. Zuern, 16 Pa. Superior Ct. 588; Com. v. Brown, 23 Pa. Superior Ct. 470; Com. v. Stovas, 45 Pa. Superior Ct. 43.

"The humane presumption of the law is against guilt, and though conspiracy must ordinarily be proved by circumstantial evidence, it is not to be forgotten that the charge of conspiracy is easily made, and in a race between creditors, suspicions of unfairness are readily awakened. Mere suspicion, possibly of guilty connection, is not to be received as proof in such a case, and especially in such a case because, when the connection is proved, the acts and declarations of others become evidence against the party accused" is the language of Judge Strong in a civil case: Benford v. Sanner, 40 Pa. 9.

A foundation should first be laid by proof, sufficient in the opinion of the trial judge, to establish prima facie the fact of conspiracy between the parties, or, at least proper to be laid before the jury as tending to establish such fact. The connection of the individuals in the unlawful enterprise being thus shown, every act and declaration of each member of the confederacy, in pursuance of the original concerted plan, and with reference to the common object, in contemplation of law, is the act and declaration of them all; and is, therefore, original evidence against each of them: 1 Taylor on Evidence, sec. 590; 1 Greenleaf on Evidence, sec. 111.

The commonwealth relies on Com. v. Donnelly, 40 Pa. Superior Ct. 116, in which this court refused to sustain an assignment of error raising the question of striking

from the record certain evidence which had been received conditioned upon the district attorney following it up with other evidence, and we said: "But there was no motion made to strike out the evidence complained of in this assignment, and it has been frequently held that in such case it was the duty of the appellant to request the court to strike it out or withdraw it from the consideration of the jury: McCarney v. People, 83 N. Y. 408. Where a motion to strike out is not made, the objection to the testimony is considered as waived: U. S. v. Gardner, 42 Fed. Repr. 832. In Com. v. Craig, 19 Pa. Superior Ct. 81, President Judge RICE speaking for the court said: "The failure of the commonwealth to make good its offer would more probably operate with the jury in the defendant's favor. Moreover, no motion was made to strike it out, nor was the court asked to instruct the jury to disregard it, as might have been done on the ground that it did not come up to the offer."

In each of the cases mentioned it appears to have been determined by the appellate court that the admitted evidence did not harm the defendant, and for that reason it was not considered a reversible error.

The same reasoning is applied in Com. v. Bell, 166. Pa. 405, where the court say in disposing of a like question, "No motion was made by the defendant's counsel to strike out her answer or so much of it as was not strictly responsive to the question, nor was any suggestion made by them that it was in any degree prejudicial to their client." And, in McKnight v. Newell, 207 Pa. 562; where the court state: "The evidence of which complaint is made in the assignment appears by comparison to be highly favorable to the plaintiffs. It does not seem, therefore, that this evidence could have harmed the plaintiffs in any way, and the refusal to strike it out is not reversible error." See also Com. v. Mellet, 27 Pa. Superior Ct. 41; Rathgebe v. R. R. Co., 179 Pa. 31. And, in Delaware & Hudson Canal Company v. Barnes, 31 Pa. 193, the trial judge received certain evidence which was clearly improper, and it was urged in

argument that the error was cured by the subsequent charge of the court. In regard to this Judge STRONG says: "It is impossible to examine the record without being convinced, that the jury did not disregard the illegal evidence, and the plaintiffs have been permitted to recover large damages, ostensibly for one cause, but truly for another, for which the defendants are not liable. Undoubtedly, when a mistake has been made in the admission of evidence on the trial of a cause, it may be subsequently ratified. It may be withdrawn by the party who has given it, or the court may withdraw it, and positively instruct the jury to disregard it—to discard it from their view. In such a case, it is the duty of the court to see to it that no mischief is done, that the illegal evidence be withdrawn, wholly withdrawn and withdrawn for every purpose."

And, in Penna. Railroad Co. v. Butler, 57 Pa. 335, the court held (SHARSWOOD, J.): "if improper evidence is given tending to inflame the damages, and it is not struck out at or before the close of the testimony, so that counsel shall not be allowed to refer to or dwell upon it in their address to the jury, it is altogether too late to cure the mistake in directing the jury to disregard it in the charge." See also Huntingdon & Broad Top Mt. Railroad Co. v. Decker, 82 Pa. 119.

In none of these cases was a motion made to strike out the objectionable evidence, and the rule is again declared in Hamory v. Railroad Company, 222 Pa. 631, in which case the court says: "Where evidence has been improperly admitted which tends to prejudice the minds of the jurors, the error is not cured by an instruction in the charge to disregard it or withdraw it from their consideration."

With this rule in force in civil cases and the general trend of decisions being to minimize the effect to be given to a strict technicality, it is a harsh application to apply it when the liberty of four persons is in the balance, for a year.

The testimony should not have been admitted in the first instance, it should have been stricken out without motion. Counsel should not have been permitted to com-

ment upon it and the jury should have been directed to wholly disregard it. These assignments of error are sustained.

In regard to the second branch of the case; the record presents the following facts: The case was tried December 7, 1910, and the verdict was returned the following day. No objection was made or exception taken to the charge of the court at the time it was delivered, or before the rendition of the verdict. On December 19, 1910, the notes of testimony and charge of the court were filed. On January 26, 1911, the appellants petitioned the trial judge, and set out at length certain portions of the charge as alleged erroneous statements of law, and averred, "that owing to the arduous work in the trial of the case, which lasted during the course of the whole day up until 10.45 P. M., counsel for the defendants was somewhat fatigued, and due to oversight he failed to ask for an exception to the part of the judge's charge as set forth," and prayed that "an exception be allowed at this time, with the same force and effect as if the same had been asked for and allowed at the close of the charge of the jury, to promote the ends of justice and preserve the interests of all parties in the case."

This petition was held by the court until June 2, 1911, when it made an order "on consideration of the foregoing petition the court allows nunc pro tunc the exceptions to the charge of the trial judge to the jury, as to those parts heretofore set forth and referred to in this petition."

When the general bill of exceptions was sealed to the record on September 26, 1911, nunc pro tunc as of December 31, 1910, Mr. Taulane, the assistant district attorney, asked the court to allow him an exception to the sealing the bill and to the making of the order of June 2, 1911, which the court declined to do. The exception requested by the commonwealth to the trial judge granting the special exception to parts of the charge was rightly refused, as there is no statute giving that right to the commonwealth.

It is urged that the charge of the court is not before us for the reason that the trial judge had no right or power to allow the exception, nunc pro tunc and that such an allowance is void.

The object of requiring counsel to except to a charge at its conclusion, is to call the attention of the trial judge to any errors or omissions so that he can then and there correct or supply them before the jury finally retires to deliberate: Com. v. Caraffa, 222 Pa. 297; Com. v. Pacito, 229 Pa. 328.

As stated in Com. v. Arnold, 161 Pa. 320, "We are not disposed to stand on mere forms. That the record is true and the judge so declares, is the substance, the form is not very material." "The charge is his charge and the filing is his act, and the statute of Westminster, still in force, the act of February 24, 1806, 4 Sm. Laws, 270, and the Act of May 24, 1887, P. L. 199, alike require that he should do it in person and certify his doing so by his own signature:" Smith v. Times Pub. Co., 178 Pa. 481.

In Farley v. Ry. Co., 32 Pa. Superior Ct. 413, the certificate of the judge, though in proper form, was on a loose independent piece of paper and was presented to this court when the case was being argued. Of this practice we said: "When it is remembered that the report of the evidence duly certified by the judge is not open to criticism in the appellate court, and that it depends for this presumption of verity upon such certificate, it is apparent that a loose paper not attached to, and not in any way identifying the stenographer's report of the testimony, and not filed in the office of the prothonotary of the court below until after the record and the stenographer's report of the testimony have been removed to the appellate court, is not a compliance with the rule, even though the paper be drawn in the exact words of the rule"; had this certificate been filed before the appeal was taken and brought up regularly with the record, a very different question would have been presented.

In Haines v. Com., 99 Pa. 410, Judge SHARSWOOD

states the practice to be: "In strictness these (bills of exceptions) ought to be presented and sealed during the trial, and such was formerly the practice in civil cases. The courts, however, have relaxed this strictness and all that is required now, is that the exception should be taken and noted at the time. It is very plain that this new practice required to be regulated by rules of court, and a reasonable time fixed within which the court should be called on to seal the bill. It ought to be within such time, "as that the matter be still fresh in the recollection of the court."

And in the same case when it was before the Supreme Court in 100 Pa. 317, Judge STERRITT said the exception should be requested and noted, and, "then or within such reasonable time as the rules of court may prescribe, seal the bill in due form."

To the trial judge may safely be left the decision of the question, whether an exception was rightly to be expected to the charge, and whether the defendant was prejudiced by it, if it should be determined to be erroneous, as well as whether such allowance was in violation of a rule of court relating to the practice in such cases. Rules of court are intended to facilitate the proper administration of the law and not to obstruct it. The court which made the rule could modify it, while the record was yet before it to the end that justice should be done.

The question was very carefully considered in Mifflin Twp. Poor District v. Poor District, 37 Pa. Superior Ct. 611, in which RICE, P. J., says: "It is not sufficient to merely file exceptions. They must be noted by the court. This is absolutely essential to entitle them to go upon the record. It must appear in some form that they were presented to the court, and were put upon the record with the express sanction of the court. As the decisions of the court upon the several written points of law submitted by the parties are not usually made upon the hearing and argument, it is apparent that the legislature did not intend to make it an imperative requirement that the exceptions be noted at that time. Nor do we think they may

not be noted after the date on which the decisions were rendered. It is due to the court, however, that they be presented to it within such reasonable time thereafter "as that the matter may be still fresh in the recollection of the court," and we have no doubt that it is within the power of the quarter sessions to declare by a general rule what is the reasonable time within which they must be presented."

The requirement that the exception shall be sealed within a reasonable time is clearly for the benefit of the trial judge while the facts are fresh in his recollection, and what is a reasonable time is best determined by the judge who is to seal the bill. Evidently the trial judge in this case considered the time reasonable, and that the matters were yet clearly before him, as he did in fact seal the bill of exceptions, while the record was still in his court.

It was the very situation had in mind by the writer of the last cited case when he says, "But be that as it may, having regard to the reason of the requirement that the exception be noted by the court, as well as to the very words of the act, we think it clear that this must be done before the writ of error (now appeal) allowed by the act may be sued out."

In Dock v. Hart, 7 W. & S. 172, Judge GIBSON held, that a bill of exception to the charge of the court if taken after the verdict is in time, if it is sealed by the court and sent up with the record.

If we stick in the black letter, and hold that the exception must be sealed at the time and during the progress of the trial, a day's delay would be as fatal as a week or a month, which would not be reasonable in the light of the decisions. In Brown v. Com., 78 Pa. 122, the caption of the indictment was entitled as in the oyer and terminer, and was amended after trial, conviction and sentence, so as to be entitled, as in the court of quarter sessions. The Supreme Court held that, "Every substantial right of the prisoner was observed, and nothing but the formality of the certificate was wanting. The lodging of a writ of error

is no test in such a case, but it is the power of the court, and the propriety of making the amendment. Where the court has the power, and exercises it properly, this court will not inquire into the state of the record before the return of the writ, but will look only at its condition when returned in obedience to the writ. If, then, it appears to be regular, its previous condition will be disregarded. Our province is not to look for error merely to reverse, but to look for merits in the cause of reversal. The day of mere technicality is past and the courts should look more at substantial justice than artificial nicety: Com. v. Keenan, 67 Pa. 203; Girts v. Com., 22 Pa. 351."

In re Sheppard's Election, 77 Pa. 295, in considering the very question involved here, it is said: "It is doubtless true that after the end of the term in which the court has rendered judgment upon a case stated, on a general or special verdict from which an appeal may be taken by writ of error, or otherwise, it cannot alter or change it with a view to correct what the court on further reflection may consider an error therein, and yet it would be going too far to say that such court may not afterwards and before any proceeding has been had upon the judgment, correct a mere mistake that has arisen in entering it differently from what was intended or perhaps directed:" Stephens v. Cowan, 6 Watts, 511. And said Judge TILGHMAN, one of the safest of judges: "But although it had not been during the term, it would not follow that the court had exceeded its power, for amendments have been allowed, not only after the term but even after error brought:" Ordroneaux v. Prady, 6 S. & R. 510. The same excellent judge said in Bailey v. Musgrave, 2 S. & R. 219: "Where the object of the amendment is to do justice, courts are vested with extensive powers, not only by statute, but by the common law. The strictness which formerly obtained in the granting of amendments, is said in our books to be almost entirely eradicated. Not only has every court the power, but it is its duty to amend a clerical error, which stands in the way of justice."

From the weight of the above authorities we feel no hesitancy in holding that the exceptions to the charge as specified in the order of June 2, 1911, were properly allowed by the trial judge and are before us for consideration.

The first, as represented by the fifth assignment of error, is as follows: "All that is necessary to establish satisfactorily and clearly in a case of conspiracy is, by evidence which may be scattered, which may relate at one time to one, two or more defendants, and at another time to another,—all that is necessary is to show that the men charged were in point of fact, in the belief of the jury, working to accomplish a certain wicked end. If that is shown, then all is shown that is necessary in order to establish the charge of conspiracy, and in this particular case the question is, does the evidence show that."

Standing alone this excerpt from the charge does not fully define a criminal conspiracy, nor how it is to be proved, but in other parts of his charge the character of the offense is elaborated, and we feel that the jury fairly understood what was necessary for them to find in order to declare the defendants guilty—in one place the learned trial judge stated, "Now a conspiracy is something that everybody can understand. There is nothing very mysterious in it. It is simply a combination between people to accomplish some illegal end." And again he states, "Only those can properly be found guilty who are shown to have had an actual connection with the illegal combination." And further, "It is claimed that the evidence shows that these defendants were all contributing to do this, with the set purpose of interfering with the rights of these men who were arrested."

The necessity for finding, that the purpose of the combination was to do an illegal act and the actual connection of some of the defendants to effect this purpose was made sufficiently clear.

The inquiry is put in the opinion refusing a new trial. What need was there for the trial judge to add to what we have quoted from his charge that the defendants must

be shown to have indulged in a "focalization of effort upon a particular object," or "breathed together to accomplish a criminal purpose"? The words used are not material, but a long line of text writers and eminent judges have emphasized the duty of the trial judge in defining in plain words the very nature of the crime so that there may not be any misunderstanding or doubt in the minds of the jury in regard to it, and the words quoted have the approval of both the appellate courts of this state. On a retrial of this case there should be a more clear and definite explanation of this matter.

The second item in the nunc pro tunc allowance as represented by the sixth assignment of error is as follows: "The law does not say that a jury must be able to say, 'We know that man is guilty,' but the law does say that the jury must be able to say, 'We sincerely believe upon the evidence that the man is guilty,' and a juryman has no right for the purpose of evading responsibility, or acting a cowardly part to say, 'Well, I doubt, I doubt as to whether the man is guilty.'" This excerpt was immediately preceded by the statement: "All defendants come into court with the presumption that they are innocent. The law says that it is the duty of the commonwealth before it can properly ask for a conviction to satisfy a jury that that presumption is overcome, that the evidence in the case shows that the people were guilty, notwithstanding the presumption, and the law goes further, and it says that a jury must not only have a sort of impression that a man is guilty, may think that the circumstances are suspicious, but that a jury must be so far satisfied that it can say it has no reasonable doubt in regard to the matter."

The charge of the court is a careful and elaborate submission of the case to the jury in an exceptionally candid manner. The instruction in regard to a reasonable doubt, and the effect to be given to it, is not sufficiently clear in the part quoted in this assignment—nor is it made clear in the other part of the charge. The only time the words

"reasonable doubt" are used in a charge covering ten pages of the paper-book, is as stated above. While it is not required that the words should be repeated, it is imperatively demanded by our decisions, that the jury should be clearly and positively instructed as to their meaning.

In other parts of the charge the trial judge used the expressions: "does the evidence or does not the evidence satisfy the jury," "all that is necessary to establish satisfactorily and clearly," etc., "in the belief of the jury," "does the evidence satisfy you that they are guilty, "whom you believe the evidence to show to be guilty," "unless you believe the evidence satisfactorily shows that they were guilty," and concluded with the part last quoted and that in the assignment.

Combining the different expressions of the trial judge in regard to the degree of proof necessary to convict, the jury would be warranted in coming to a conclusion that they could accept and act upon a much lower grade or standard of proof or doubt than is required in this state.

When a reasonable doubt, within the meaning of the law and under the evidence, exists, it is the property of the defendant, and must result in an acquittal. The principle is too well recognized and important to be ignored: Com. v. Rider, 29 Pa. Superior Ct. 621. It is a time-honored safeguard upon which all defendants have a right to rely: Com. v. Devine, 18 Pa. Superior Ct. 431.

In Com. v. Deitrick, 221 Pa. 7, the trial judge said: "If on the other hand, however, you reach the conclusion from the preponderance of the credible evidence in the cause, that the prisoner unlawfully and maliciously shot and killed Jones, the deceased, then we will say to you that it would be your duty to convict" and it was held to be inadequate, even though in other parts of the charge, the trial judge directed the jury that "in order to convict the defendant, the testimony on behalf of the Commonwealth must satisfy their minds of his guilt beyond a reasonable doubt," but Judge Stewart states: "It is impossible to tell which of the conflicting directions were

368    COMMONWEALTH *v.* DUFFY, Appellant.

Opinion of the Court—Dissenting Opinion.    [49 Pa. Superior Ct.

observed by the jury." See Com. v. Andrews, 234 Pa. 000, filed February 5, 1912.

The material testimony offered by the commonwealth in this case came from a challenged source—the witnesses being reformed criminals and their credibility was directly attacked, so that it was specially important, that the jury should be fully and clearly instructed on the question of reasonable doubt. This assignment of error is sustained.

When the exception nunc pro tunc was allowed on June 2, 1911, the practice which had theretofore existed under the Acts of February 24, 1806, 4 Sm. L. 270, April 15, 1856, P. L. 337, and March 24, 1877, P. L. 38, as interpreted in Curtis v. Winston, 186 Pa. 492, and many cases following it, had been radically changed by the Act of May 11, 1911, P. L. 279, which provides that exceptions may be taken without allowance by the trial judge to any part or all of the charge, or to the answers to points for any reason that may be alleged regarding the same in the hearing of the court before the jury retires to consider its verdict or, thereafter by leave of the court; and they shall be thereupon noted by the official stenographer and thereafter shall have all the effects of exceptions duly written out, signed and sealed by the trial judge at the time of the trial. While this act is not retroactive, the necessity for the earlier requirement of noting the exception before verdict was done away with,—when this statute became operative.

The judgment is reversed and a new trial awarded.


RICE, P. J., dissenting:

It cannot be contended that there was not sufficient competent testimony in the case to warrant the jury, if they believed it, in finding the defendants guilty. The grounds upon which the judgment is to be reversed and the cause sent back for a retrial are, that the court erred (1) in the admission of incompetent evidence, and (2) in its charge to the jury. Being unable to concur in the judgment, it seems right, in view of the very able discussion of

the case in the opinion of the majority, that I should at least state the grounds of my dissent.

1. I am of opinion that the first and second assignments of error should be overruled, not merely for the technical reason that the defendants did not move to strike out the testimony, but for the substantial reason that, as the evidence stood when the commonwealth rested, sufficient connection was shown between the persons whose statements were put in evidence and the defendants in the case to make the testimony competent, and, therefore, the court would not have been bound to strike it out, even if the motion had been made. The order of testimony is a matter very much within the discretion of the judge trying the case, and the admission of testimony not fully competent at the time of its admission is ordinarily no ground for reversal, if it be rendered competent by the subsequent admission of other testimony.

2. My conclusion that the third and fourth assignments of error should be overruled rests on different grounds. The fact that certain persons came to the prisoners' cell about three o'clock P. M., and asked their names, seems to be irrelevant, but I cannot see that the admission of the fact in evidence was prejudicial to the defendants, or ground for reversal. The fact that until that time the prisoners' names had not been taken or asked for, was pertinent, under the circumstances. I am inclined to the opinion, also, that the evidence alluded to in the fourth assignment of error was not harmful to the defendants. No fact was elicited, and there was nothing in the answer of the house sergeant which tended to incriminate them. The most serious objection, it seems to me, that may be made against this testimony, is that it was irrelevant. But the irrelevancy was not of such gravity and of such misleading character as to be ground for reversing the judgment on this assignment.

3. I am of the opinion that the assignments of error to the judge's charge should be overruled because no exception was taken, or asked for, to the charge, before

verdict rendered, and this was essential in order to bring the charge on record for purposes of review. Curtis v. Winston, 186 Pa. 492, which is authority for this proposition, has been followed in a large number of cases since the time it was rendered, and amongst them, I refer to Com. v. Johnston, 44 Pa. Superior Ct. 218 (a criminal case), and the recent cases therein cited. There is a distinction between asking for an exception and the sealing of a bill, and upon that subject I call attention to Haines v. Com., 99 Pa. 410, s. c. 100 Pa. 317, and Phelps v. Mayer, 56 U. S. 160. In my judgment, the sealing of a bill by the judge, incorporating parts of his charge, several weeks after the verdict was rendered, particularly for the reason upon which it was asked, could not have the effect of curing the omission to except to the charge before verdict rendered.

I feel no hesitation in invoking the rule above referred to because, after consideration of the charge, as a whole, I am of opinion that no injustice will result therefrom.